UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                        CRIM. CASE NO. 12-20667

v.                                         PAUL D. BORMAN
                                           UNITED STATES DISTRICT JUDGE

ALI BAZZI,

        Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
SEIZED FROM DEFENDANT'S TWO CELL PHONES**

On April 1, 2013, Defendant Ali Bazzi filed a Motion to Suppress Evidence seized from Defendants two cellular phones on October 15, 2012 at a residence at 7555 Neckel Street in Dearborn, Michigan. On that date, a law enforcement task force of Federal and State officers had executed arrest warrants for many of the Defendants, and in particular, an arrest warrant for Defendant Bazzi at that address.

The Government filed a response to the Motion on April 8, 2013.

The Court held an evidentiary hearing on April 30, 2013, and heard argument by counsel on May 2, 2013.

The Government's first witness at the evidentiary hearing was Alcohol Tax Firearms Explosives (ATFE) Special Agent Curtis Brunson. He was assigned to the arrest team for Defendant Ali Bazzi. TR. April 30, 0213, Brunson P.7.

Brunson testified that at the pre-arrest briefing he was told:

1

> In the event the Defendants were arrested, if you come across any cell phones that they may possess, to retrieve the cell phones, at which time a search warrant would be obtained later.

Asked by the prosecutor whether he was told why the briefing agent wanted the cell phones retrieved, S.A. Brunson responded:

> For the most part it was related to the investigations. I can't recall exactly what the alleged charges were relating to the cell phone, but it was related to the investigation itself.

TR. P. 8. Brunson and two other task force members, Michigan State Trooper Pechman and Dearborn Corporal Anhut went to a residence on Neckel Street in Dearborn, where, after knocking, they found Defendant Bazzi at the side door. TR. P. 12. Brunson testified that Defendant Bazzi appeared to have just awakened – no shirt, no shoes, so after arresting and handcuffing him, they took him back into the house to let him get dressed. *Id*.

Brunson testified that upon entering the house, Defendant told them that his clothes are near the couch where he'd been sleeping; also there were his ID and phones. TR. P. 13. Brunson said that the couch looked like someone had been sleeping on it, with clothing and shoes nearby. TR. P.13.

Brunson testified that they uncuffed Defendant to take him back to that couch area to get dressed, and they seized the cell phones on the table next to the couch which they saw while he was getting dressed at the couch. P. 14-15. Thereafter Dearborn Police Corporal Anhut re-handcuffed Defendant and walked him out to the Dearborn Police Car. *Id*.

Brunson testified that while being walked out of the house, Defendant's mother who had been sleeping in another area of the house came out the front door to the front porch to ask them where and why he was being taken away. TR. 16. Brunson testified that the officers explained

to her that he was being arrested and taken to the Dearborn Police Station and then to the U.S. Marshal's office.  TR. 17.

Brunson further testified that the officers did not "clear the house" by going through it to check for other persons because Defendant Bazzi immediately opened the door and identified himself, and was put into custody.  TR. 18.

On cross examination, S.A. Brunson testified there was furniture on the first floor; that was the location of the couch on which Defendant had been sleeping.  TR. 24.  He further testified that the officers didn't go further into the house than the living room where Defendant had been sleeping; not into the basement or upstairs, and "I don't think we even went into the kitchen." TR. P. 25.  With regard to securing Defendant Bazzi's identification, Brunson further testified: "If I'm not mistaken there was a wallet and his ID was in it." TR. P. 26.

Brunson testified that he did not fill any documentation or return that Defendant Bazzi had a wallet because "I wouldn't have secured a wallet.  I would have taken the ID out of the wallet and left the wallet.  TR. P. 26. Brunson further testified:

> I'm not for certain that I looked in the wallet, but I know there was
> ID secured from the table, and as a matter of fact, I am certain
> there was a wallet, because I secured his ID from the wallet at his
> direction.

TR. P. 26.

Brunson further testified that the officers were in the house no longer than seven or eight minutes while Defendant was getting dressed, that Defendant had indicated his step-mother was sleeping, and that his mother did not come downstairs during that time.  TR. P. 27.

S.A. Brunson further testified that neither he nor other officers asked his mother, Mrs Bazzi, to go into the house and retrieve the cell phones.  TR. P. 29.  Brunson denied that

Defendant's step-mother was downstairs when he seized the phones.

Brunson disagreed with the accuracy of the ATF property seizure report that stated that the phones had been seized from Defendant Bazzi's person: "Directly from him, no. Within his reach, span, yes." TR. P. 33-34.

The Defense then called Defendant's step-mother Mrs. Kathy Bazzi to the stand.

Mrs. Bazzi testified that when the officers arrived at 8:30-9am she was upstairs on the second floor, saw the police put Defendant in a police car, and then came out the front door and asked what was going on.

Mrs. Bazzi further testified that one of the officers said "Ali wants his cell phones" and she went back into the house, retrieved them from under the couch in the living room (bed still made) and gave them to the officer.

She testified that there was a couch in the living room, but "assumed" that Defendant slept in the basement where the TV was located.

On cross-examination, Mrs. Bazzi testified that she did not know where Defendant had slept.

Finally on redirect, Mrs. Bazzi testified that she never knew Defendant to carry a wallet.

Defendant then called Dearborn Police Corporal Walter Anhut to testify.

Corporal Anhut testified that he knocked on the side door; Defendant Bazzi responded wearing boxer shorts and a t-shirt. All three officers went into the house (landing) to arrest Defendant and handcuff him. Defendant was then taken from the landing by the door to the room where he had been sleeping and where his clothes were.

On cross-examination, Anhut testified that S.A. Brunson seized Defendant Bazzi's ID

4

and cell phones from the couch which was 10-15 feet away.

**Defendant Ali Bazzi**

Defendant Ali Bazzi then testified that when Corporal Anhut encountered him at the side door, Anhut told him to step outside, he did, and was immediately put in a police car. According to Bazzi, more of the agents stepped foot in the house. Bazzi further testified that one of the agents asked the others: "Didn't you get his cell phones," and when the answer was "no," the ATFE agent told the Dearborn Police officer to go and get the phones.

On cross-examination, Defendant Bazzi testified that when he came to the door, he was wearing his pajamas and sandals; his pajamas were a Jordan brand sweat pants and sweatshirt. Bazzi further testified that he slept in the basement. He also testified that he was not sure if Corporal Anhut was in uniform. Bazzi also testified that the ATF agent told his mother to get the cell phones. Finally, Bazzi testified that he never carried a wallet in his life.

**Michigan State Police Trooper Ray Pechman**

The last defense witness was Michigan State Police Trooper Ray Pechman who was part of the raid team at Bazzi's house.

He testified that at the pre-raid briefing, they were told to arrest the defendants and take the cell phones.

Pechman further testified that when he saw Defendant at the side door with Corporal Anhut and S.A. Brunson, Defendant was handcuffed, and not completely dressed – maybe wearing boxers, the agents took him inside to get his clothing which was in the front room by the couch which had a pillow and blanket on it. Pechman further testified that the agents took one cuff off so the Defendant could put on a shirt.

Pechman further testified that S.A. Brunson seized the two cell phones next to the couch, and once Bazzi was dressed, the agents re-handcuffed him and put him in a Dearborn Police car. At that point, Defendants step-mother, Mrs. Bazzi came out on the front porch and asked what was going on; the agents told her that Defendant Bazzi was being transported to the Dearborn Police department.

Trooper Pechman testified that the agents did not ask Mrs. Bazzi to go back into the house, get the cell phones and bring them out to the agents.

Trooper Pechman testified that the agents did not "clear" the house by checking all the rooms when they went in to the room to have the arrested Defendant put on his clothes.

Finally, Trooper Pechman testified that none of the agents retrieved any cell phones from the Defendant.

**Factual Conclusion**

The Court finds credible the testimony of Task Force Agents Brunson and Pechman that Defendant came to the door without wearing clothing that would have permitted immediate transport to the police station, therefore necessitating that the agents enter the house to permit Defendant to put on that clothing lying next to the couch where he had been sleeping.

The Court finds not credible Defendant Bazzi's testimony that he came to the door fully clothed.  The Court further finds, not credible – indeed incredible – Bazzi's testimony that all of the agents took him right to the car from the front door, with none of the agents entering the house. Indeed, it would fly in the face of Defendant's principal claim that the agents were specifically directed to seize the Defendant's phones, regardless of the Defendant's location, to now assert by Defendant's testimony that no agent ever went into the house to seize the phones

6

after handcuffing him at the door.

Further, Defendant's testimony, and his step-mother's testimony, that the agents did not <u>ever</u> enter the house to get the phones, is not credible; indeed it is incredible to assume that the agents would have trusted the multi-convicted Defendant's step-mother to dutifully follow their request to seize and "bring out Ali's phones" from the house under the guise that he wanted them with him in jail.  It is inconceivable that the agents would have trusted Defendant's step-mother to go back into the house, without an accompanying agent, to provide them with Defendant's phones, which she would have had the ability to hide, destroy, switch with hers, or tamper with.

While the agents, who encountered a compliant, though not fully clothed Defendant at the door, did not see a need to "clear this house" –  they didn't encounter other persons at the door, or hear noises – it does not follow logically that they would permit this multi-convicted, just arrested Defendant's step-mother to go in by herself and bring them evidence incriminating him.

The Court finds credible that Defendant was arrested early in the morning not fully clothed, and that the agents took him into the house to get clothes where they saw the phones next to the clothes and properly seized them incident to the arrest, as incriminatory evidence.

Defense counsel contended in closing, that the agents should have secured a search warrant for the Defendant's phones prior to the seizure, because "they knew early on that the phones were used in the robbery."  The Court notes Defendant's concession that the agents were aware that the phones were used in the robbery, thereby justifying their seizure, in plain view, incident to the arrest.  And, of course, the agents did get a search warrant before searching the phones.

7

**Legal Conclusion**

In *Chimel v. California*, 89 S.Ct. 2034 (1969), the Supreme Court held that a search incident to arrest can only include the arrestee's person and the area within his immediate control – the area from within which he might gain possession of a weapon or destructible evidence. The Supreme Court elaborated on what constituted "the area within his immediate control" in *Arizona v. Gant*, 129 S.Ct. 1710, 1716 (2009):

> That limitation which continues to define the boundaries of the [4th Amendment] exception, ensures that the scope of the search incident to arrest is commensurate with its purposes of protecting arresting officers and safe-guarding any evidence of the arrest that an arrestee might conceal or destroy.

A logical reading of these words would cover the area close to the arrestee. In this case, the area from which Defendant Bazzi's cell phones were seized, was right next to where Defendant had slept and where his clothing was located.

In *Maryland v. Buie*, 110 S.Ct. 1093, 1096 (1990), the Supreme Court held that if the detectives' "entry into the basement was lawful, the seizure of the red running suit, which was in plain view and which the officer had probable cause to believe was evidence of a crime, was also lawful under the Fourth Amendment." The phones here, used in the robbery, are similar to the red running suit in *Buie*, and their seizure was lawful under the Fourth Amendment.

Thus, in the instant case, the arrest warrant permitted the officers to seize the Defendant, enter the premises to let him get the clothes to get dressed and seize the phones in plain view next to the clothing.

Finally, the testimony that the task forces at the pre-arrest briefing had been provided reasons why the cell phones were to be seized as evidence of the crime, supported the officers

seizure of the Defendant's cell phones under the Supreme Court decision in *Whitely v. Warden*, 91 S.Ct. 1031, 1037 (1971): officers called upon to aid other officers in executing arrest warrants are entitled to rely on the information possessed by the officers requesting assistance.  Here there is no challenge to the arrest warrant, and the seizure of the phones was proper as incident to the arrest.

Accordingly, Defendant Bazzi's Motion to Suppress his telephones seized at his residence at the time of his arrest is DENIED.


DATED: May 15, 2013                                  s/Paul D. Borman
                                                     PAUL D. BORMAN
                                                     UNITED STATES DISTRICT JUDGE

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 16, 2013.

                                                     s/Deborah R. Tofil
                                                     Deborah R. Tofil